UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

| | |
|---|---|
| KENT HIGGINS and JENNIFER HIGGINS, Individually and as Parents and Natural Guardians, and Next Friend on behalf of AH and NH, Minors, and JOHN TAYLOR and SARAH TAYLOR, Individually and as Parents and Natural Guardians, and Next Friend on behalf of JT, A Minor, and RACHEL TAYLOR, <br><br> Plaintiffs, <br><br> v. <br><br> KOCH DEVELOPMENT CORPORATION d/b/a Holiday World & Splashin' Safari, <br><br> Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) 3:11-cv-81-RLY-WGH ) ) ) ) ) ) |

**ENTRY ON DEFENDANT'S MOTION TO EXCLUDE EXPERT TESTIMONY**

Plaintiffs, Kent and Jennifer Higgins, individually and on behalf of their minor children, AH and NH, along with John and Sarah Taylor, individually and on behalf of their minor child, JT, and the Taylor's adult child, Rachel Taylor, brought this suit against Defendant, Koch Development Corporation, d/b/a Holiday World & Splashin' Safari. Plaintiffs allege that Defendant improperly maintained its chemical filter pumps and electrical breakers, causing Plaintiffs to suffer serious injuries. Defendant seeks to bar the expert testimony of Dr. Anthony Margherita, who examined Kent Higgins,

1

Rachel Taylor, and Sarah Taylor.  For the reasons set forth below, Defendant's motion is **GRANTED IN PART** and **DENIED IN PART**.[1]

## I.   Background

On June 20, 2009, Plaintiffs visited Holiday World & Splashin' Safari and used the river attraction, "Bahari River."  (Compl. ¶ 10).  This attraction was 1,100 feet long and 20 feet wide.  (*Id*.).  A filter pump connected to a breaker filtered muriatic acid and liquid bleach into the water.  (*Id*.).  The breaker that controlled this pump was tripped and shut off.  (*Id*. at ¶ 11).  Plaintiffs allege that Defendant's employee then negligently turned the breaker back on without checking the amount of muriatic acid and liquid bleach that would be released, causing a high concentration of the acid and bleach to be released into the river.  (*Id*. at ¶ 12).  During this time, Plaintiffs were swimming and lying in the river and, as a result, they suffered serious personal injuries and have developed breathing disabilities.  (*Id*. at ¶¶ 13, 15-22).

On May 9, 2011, Plaintiffs filed this action against Defendant, claiming that its conduct caused their bodily injuries.  Plaintiffs subsequently endorsed Dr. Margherita as

---

[1] On July 26, 2013, Rachel and Sarah Taylor filed a supplemental response brief "to provide the Court with more detailed information."  (Docket # 151).  They filed this brief two weeks after Defendant filed its Reply brief.  The court's local rules do not contemplate sur-replies without leave of the court.  S.D. IND. L.R. 7.1(c).  Thus, the court hereby **STRIKES** the supplemental response as improperly filed.

Similarly, on July 31, 2013, Kent Higgins filed an individual response brief, in which he incorporated Rachel and Sarah Taylor's initial response brief and provided additional information.  (Docket # 152).  Defendant moved to strike this response as untimely, and Plaintiffs did not respond.  (Docket # 155).  Accordingly, the court treats Kent Higgins' individual brief as a sur-reply without leave of the court, also in violation of Local Rule 7.1(c).  Thus, the court **GRANTS** Defendant's motion to strike Kent Higgins' individual response brief and will consider only Rachel and Sarah Taylor's initial response in deciding this motion.

a medical expert in this matter to testify regarding his examinations of Kent Higgins, Rachel Taylor, and Sarah Taylor and give opinions regarding the effect the injuries sustained on June 20, 2009, have on their ability to work and their need for future medical care.

Dr. Margherita attended Georgetown University for both his undergraduate studies and medical school. (Deposition of Dr. Anthony Margherita ("Margherita Dep.") 17:12-17). He is a board certified physiatrist who completed his residency at the University of California at Davis. (*Id*. at 17:18-18:3). He specializes in physical medicine and rehabilitation and has been practicing for 23 years. (*Id*. at 17:22-18:15). He has served as an Assistant Professor of Physical Medicine and Rehabilitation Medicine at Washington University; Associate Professor in the Departments of Neurology and Orthopedic Surgery at Washington University; and Assistant Professor in the Department of Rehabilitation Medicine at the University of Washington. (Def.'s Ex. B, Dr. Margherita's Curriculum Vitae).

Dr. Margherita examined Kent Higgins on August 5, 2012, and Sarah and Rachel Taylor on August 7, 2012, to determine each patient's "level of impairment." (Def.'s Exs. C, D, and E). Dr. Margherita's examination for each individual included a "review of medical records . . . , direct questioning of the patient, and a comprehensive physical examination." (*Id*.).

Based on this analysis, Dr. Margherita concluded that Kent Higgins "suffers from a severe form of reactive airway disease that is the direct result of his exposure to chlorine at the Holiday World water park." (Def.'s Ex. C at 5). Specifically, Higgins

3

experienced shortness of breath with exertion, changes in temperature, and exposure to airborne fumes; as a result, Higgins must use medications and fast-acting inhalers to remain relatively functional. (*Id*.). To that end, Dr. Margherita concluded that Higgins' "work and avocational activities have been significantly affected by his condition." (*Id*.). Based on Higgins' lung function, he recommended Higgins "discontinue his outside occupation and seek alternative employment in an indoor, air conditioned environment." (*Id*.). Lastly, Dr. Margherita concurred with the opinions of Higgins' treating pulmonary physician, Dr. Linda Haacke, that Higgins will likely remain impaired for the remaining years of his life and will require chronic treatment with medications and inhalers. (*Id*.).

Similarly, Dr. Margherita concluded, chiefly, that Sarah Taylor "suffers from a moderate form of reactive airway disease that is the direct result of her exposure to chlorine at the Holiday World water park." (Pls.' Ex. 3 at 4). Because of this condition, Dr. Margherita concluded that she must use medications and inhalers to remain relatively functional. (*Id*.). Dr. Margherita further stated that Sarah Taylor would "need to work in an air conditioned temperature controlled environment with limited exposure to airborne irritants." (*Id*.). And Dr. Margherita agreed with Sarah Taylor's treating physician, Dr. Trudy Shady, that Sarah Taylor will likely remain impaired for the remaining years of her life and would require chronic treatment with medications. (*Id*.).

Finally, Dr. Margherita concluded that Rachel Taylor "suffers from a moderate form of reactive airway disease that is the direct result of her exposure to chlorine gas at the Holiday World water park." (Def.'s Ex. E at 3). As a result, he found she must use medications and inhalers to remain relatively functional, though she would be limited in

4

her ability to engage in any specific outdoor occupation.  (*Id*. at 3-4).  Moreover, Dr. Margherita concurred with Rachel Taylor's treating physician, Dr. Shady, just as he had with the other treating physicians.  (*Id*. at 4).

After Dr. Margherita completed these examinations, Plaintiffs' counsel sent him six reference articles to review which explained "the cause and effect relationship of chlorine gas exposure and lung/heart injuries." (Def.'s Ex. F).  Further, Plaintiffs' counsel requested that he add an addendum explaining this relationship to any reports which had already been finalized.  (*Id*.).  Consequently, Dr. Margherita discussed this medical literature in Rachel Taylor's report and in a supplemental report for Sarah Taylor.  In sum, Dr. Margherita concluded that the literature supported his opinions that exposure to chlorine gas is the direct cause of Rachel and Sarah Taylor's present pulmonary disease.  (Def.'s Ex. E, Pls.' Ex. 3).

Based upon his examinations and review of medical records, Plaintiffs argue that Dr. Margherita should be permitted to render the following opinions: (1) he concurs with the treating pulmonologist, Dr. Shady, regarding the injuries suffered by Rachel and Sarah Taylor; (2) Rachel and Sarah Taylor should take the medications outlined by Dr. Shady; (3) Plaintiffs should avoid any work environment where they would be exposed to airborne irritants; and (4) a causal relationship exists between exposure to chlorine gas and the respiratory injuries suffered by Plaintiffs.  Defendant moves to exclude these opinions in their entirety.

**II.      Discussion**

A federal court exercising diversity jurisdiction must apply state law to substantive issues, but the admissibility of expert testimony in diversity suits is governed by the Federal Rules of Evidence. *Stutzman v. CRST, Inc.*, 997 F.2d 291, 295 (7th Cir. 1993). In particular, Rule 702 of the Federal Rules of Evidence ("Rule 702") and the principles set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), govern the admissibility of expert testimony. *Smith v. Ford Motor Co.*, 215 F.3d 713, 717-18 (7th Cir. 2000). Rule 702 states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702.

The court must ensure "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597. To that end, the Seventh Circuit has set forth a three-step analysis: (1) the witness must be qualified as an expert by knowledge, skill, experience, training, or education; (2) the expert's reasoning or methodology underlying the testimony must be scientifically reliable; and (3) the testimony must assist the trier of fact to understand the evidence or determine a fact in issue. *Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904 (7th Cir. 2007) (citations and internal quotations omitted). The party proffering the expert testimony

must show these factors by a "preponderance of proof." *United States v. Allen*, 207 F. Supp. 2d 856, 869 (N.D. Ind. 2002) (citing *Daubert*, 509 U.S. at 592 n. 10). Here, Defendant principally challenges Dr. Margherita's qualifications and the reliability of his opinions.

### A. Qualifications

An expert may be qualified by "knowledge, skill, experience, training, or education." FED. R. EVID. 702. For example, "extensive academic and practical expertise" in an area is sufficient to qualify a potential witness as an expert. *Bryant v. City of Chicago*, 200 F.3d 1092, 1098 (7th Cir. 2000). Additionally, testimony may be admitted by experts whose knowledge is based on experience. *Smith*, 215 F.3d at 718. Hence, "a court should consider an expert's full range of practical experience as well as academic or technical training when determining whether the expert is qualified to render an opinion in a given area." *Id*. Because simply possessing a medical degree does not qualify Dr. Margherita as an expert in all medical fields, the court examines the qualifications of Dr. Margherita as to each proposed opinion. *See Baldauf v. Davidson*, No. 1:04-cv-1571, 2007 WL 2155967, at *3 (S.D. Ind. July 24, 2007).

### 1. Concurring with Pulmonologist

Defendant argues that Dr. Margherita is not qualified because he neither has training nor experience in pulmonology; accordingly, Defendant claims he is giving testimony outside his expertise of physical medicine and rehabilitation. Indeed, Dr. Margherita is not board certified in pulmonology, nor does he have any specialized training or education in that field. (Margherita Dep. 103:1-6). Although Dr. Margherita

7

has done some research in exercise physiology and worked with pulmonologists in the past, the field of pulmonology is not part of his current medical practice, nor has it ever been a part aside from research early in his academic career. (*Id*. at 101:3-14; 103:14-20). Because of this lack of experience, he would typically refer a patient to a pulmonologist where a lung injury was the primary source of her impairment. (*Id*. at 102:6-25).

Nonetheless, Plaintiffs maintain that Dr. Margherita should be able to testify that he concurs with treating pulmonologist, Dr. Shady, regarding (1) the injuries suffered by Rachel and Sarah Taylor, and (2) the medications prescribed to them. Plaintiffs concede, however, that Dr. Margherita is not being endorsed as a pulmonologist. As a result, Plaintiffs are offering a doctor without any academic expertise and little experience in a medical field to concur with the opinions of a specialist. This provides little, if any, value to the trier of fact. Dr. Margherita therefore does not have a sufficient foundation for concurring with a pulmonologist's opinions, so his endorsement of Dr. Shady's opinions is excluded.

### 2. Impact Injuries have on Ability to Work

Plaintiffs further contend that although Dr. Margherita is not offered as a pulmonologist, he is still qualified to testify as to how these respiratory injuries will impact Plaintiffs' lives and their ability to work. In fact, Dr. Margherita has treated patients for issues of chemical or environmental exposures. (*Id*. at 101:15-20). And this treatment mostly related to their functional performance, work activities, and potential for rehabilitation. (*Id*. at 102:6-10). For example, Dr. Margherita testified that in his

8

expertise as a physiatrist, he is asked on a "fairly regular basis" whether a patient can "do their prior employment, can they do any employment . . . [and] in what circumstances would they be functionally capable of engaging in whatever their activity is . . . ." (*Id*. at 77:11-23). In other words, he focused on the vocation and avocation aspects of a patient's treatment. (*Id*. at 102:11-15). Based on this experience, Plaintiffs argue Dr. Margherita may testify as to how Plaintiffs' injuries have affected their ability to work and other limitations.

The court agrees. Dr. Margherita has relevant experience treating patients exposed to chemical exposures, as allegedly occurred here, and this treatment focused on their functional performance, as Plaintiffs seek to rely on here. Accordingly, Dr. Margherita has established a sufficient foundation to testify as to these issues.

### 3.  Costs of Medications and Doctor Visits

Plaintiffs also claim Dr. Margherita should be able to testify as to the "reasonableness of the costs of the medications and doctor's visits" because "physiatrists frequently are the professionals that approve life care plans." Plaintiffs fail to cite to any evidence in the record supporting this statement. And Dr. Margherita did not testify to any independent knowledge of costs of medications or doctor's visits. By contrast, he stated that he only "occasionally" prescribes inhalers for patients that are undergoing treatments for other conditions and would typically refer them to a pulmonologist for more "chronic or steroid based [prescriptions]." (*Id*. at 52:7-18). In fact, Dr. Margherita's only knowledge of the Taylors' prescription needs and dosages derives from Dr. Shady's report, along with a printout provided by Plaintiffs' counsel detailing

medications and average retail costs. (*Id*. at 99:14-21). Indeed, Dr. Margherita did not independently verify those costs. (*Id*. at 99:19-21). This alone discredits his testimony. *See MDG Int'l, Inc. v. Australian Gold, Inc.*, No. 1:07-cv-1096, 2009 WL 1916728, at *5 (S.D. Ind. June 29, 2009) ("An expert must independently verify facts given to him, rather than 'accepting [them] at the word of ... counsel.'" (citation omitted)). At its core, Plaintiffs are arguing that simply because Dr. Margherita is a doctor, he can testify as to the costs of medications and doctor bills. This is not enough to create a sufficient foundation to testify about these topics. Accordingly, he is excluded from testifying about these issues.

### 4. Causal Relationship Between Chlorine Exposure and Respiratory Injuries

Lastly, Plaintiffs contend that Dr. Margherita may testify about the causal relationship between exposure to chlorine gas and the respiratory injuries suffered by Plaintiffs. Defendant argues that the only knowledge he has in this area is derived from medical articles which Plaintiffs' counsel provided to him *after* he examined the Plaintiffs. In fact, the letter from counsel accompanying these articles stated, "If your report has been finalized, I would request that you add an addendum explaining the cause and effect relationship of chlorine gas exposure and lung/heart injuries." (Def.'s Ex. F). Defendant further argues that Plaintiffs have not shown how Dr. Margherita's training in physical medicine demonstrates expertise in chlorine gas exposure.

As an initial matter, the court must be wary that experts are not simply parroting the opinions of counsel. *See King-Indiana Forge, Inc. v. Millennium Forge, Inc.*, No.

10

1:07-cv-00341, 2009 WL 3187685, at *2 (S.D. Ind. Sept. 29, 2009) ("When an expert's proffered opinion merely parrots information provided to him by a party, that opinion is generally excluded."). This is particularly true here, where counsel has provided medical literature to the expert and asked him to include such information in his report. Nonetheless, the articles provided by Plaintiffs' counsel did not alter the conclusions of Dr. Margherita's report; rather, they provided additional support for his initial conclusions. (Pls.' Ex. 3 at 6). Although the timing of reviewing the literature would no doubt open Dr. Margherita up to vigorous cross-examination, it cannot be said that Dr. Margherita is simply parroting the information provided by counsel. Accordingly, the court will consider these articles as part of the foundation Dr. Margherita used in forming his opinions. *But see Baldauf*, 2007 WL 2155967, at *4 (stating that even though doctor reviewed articles in peer-reviewed journals on the effects of a drug, this alone would not qualify him as an expert in the subject).

In addition to reviewing these articles, Dr. Margherita has experience treating patients for chemical and environmental exposures. (Margherita Dep. 101:15-20). It is unclear to what extent Dr. Margherita has dealt specifically with chlorine exposure in this treatment, but again that is something which may be assailed by cross examination. *See Daubert,* 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."). Though Dr. Margherita's qualifications in this area leave much to be desired, the court will assume *arguendo* that he has satisfied this requirement. *See Allstate Ins. Co. v. Maytag Corp.*,

11

No. 98 C 1462, 1999 WL 203349, at *3 (N.D. Ill. Mar. 30, 1999) ("Questions about the qualifications of an expert witness should be considered in assessing the credibility and weight of the opinions offered, and should not serve to exclude them altogether").  As will be seen below, however, the methodology he used was not scientifically reliable and thus this testimony will be excluded on those grounds.

### B.  Methodology

The court's analysis, however, does not end with the conclusion that an expert is qualified to testify about a given matter.  Indeed, "[e]ven a 'supremely qualified expert cannot waltz into the courtroom and render opinions unless those opinions are based upon some recognized scientific method.'" *Smith*, 215 F.3d at 718 (citation omitted).  Specifically, an "expert's work is admissible only to the extent it is reasoned, uses the methods of the discipline, and is founded on data.  Talking off the cuff – deploying neither data nor analysis – is not an acceptable methodology." *Lang v. Kohl's Food Stores, Inc.*, 217 F.3d 919, 924 (7th Cir. 2000); *see also Comer v. Am. Elec. Power*, 63 F. Supp. 2d 927, 933 (N.D. Ind. 1999) (finding the court must "rule out subjective belief and speculation").  At bottom, "[t]he fundamental purpose of this gatekeeping requirement 'is to make certain that an expert, whether basing testimony on professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" *Comer*, 63 F.Supp.2d at 932 (quoting *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999)).  To that end, the court must determine whether the opinions are grounded in the methods and

procedures of science and whether such testimony has sufficient factual underpinnings. *Bourelle v. Crown Equip. Corp.*, 220 F.3d 532, 536 (7th Cir. 2000).

In making this determination, the court is guided by the factors set forth in *Daubert*:

> (1) Whether a theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; and (5) whether the technique or method has been met with general acceptance.

*Daubert,* 509 U.S. at 593-94. These factors are used to evaluate "all expert testimony, whether it relates to an area of traditional scientific competence or whether it is founded on engineering principles or other technical or specialized expertise." *Smith*, 215 F.3d at 719. But this should not be considered a definitive checklist as the court is free to "fashion an approach more precisely tailored to an evaluation of the particular evidentiary submission before it." *United States v. Conn*, 297 F.3d 548, 556 (7th Cir. 2002). Finally, the court must only evaluate the "principles and methodology, not . . . the conclusions that they generate." *Daubert*, 509 U.S. at 595.

Defendant attacks Dr. Margherita's methodology with several principal arguments: (1) lack of specialized or independent testing; (2) failure to review Plaintiffs' pre-accident records; and (3) failure to test conclusions with scientific method.

### 1. Lack of Specialized and Independent Testing

First, as to Defendant's arguments regarding the lack of specialized and independent testing done by Dr. Margherita, it is not necessary to evaluate these

13

criticisms. Indeed, they relate to his concurrence of Dr. Shady's diagnosis, which the court excluded based on a failure to show sufficient qualifications. Thus, these arguments are now moot.

### 2. Failure to Review Plaintiffs' Pre-Accident Records

Next, Defendant cites Dr. Margherita's failure to review Kent Higgins' pre-accident medical condition. This alleged omission, though, goes towards the weight given to his opinion. Indeed, if Dr. Margherita failed to take into account how Plaintiffs' prior condition would impact their work capacities, this would undercut the strength of his opinion. Additionally, Defendant has not set forth any evidence that either Rachel or Sarah Taylor had any relevant pre-accident medical history. Thus, this factor does not merit exclusion.

### 3. Failure to Test Conclusions

Defendant argues Dr. Margherita failed to test his conclusions using the scientific method and thus his opinions are merely speculative. The "first and most significant *Daubert* factor is whether the scientific theory has been subjected to the scientific method." *Bradley v. Brown*, 42 F.3d 434, 438 (7th Cir. 1994). This is because bottom line conclusions do not assist the court and must be excluded. *See Huey v. United Parcel Serv., Inc.*, 165 F.3d 1084, 1087 (7th Cir. 1999) ("an expert must substantiate his opinion; providing only an ultimate conclusion with no analysis is meaningless"). An "expert must offer good reason to think that his approach produces an accurate estimate using professional methods, and this estimate must be testable." *Zenith Electronics Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 419 (7th Cir. 2005). To that end, reasonable

methodology upon which to base an opinion may include either "hands-on testing" or "review of experimental, statistical, or other scientific data generated by others in the field." *Cummins v. Lyle Indus.*, 93 F.3d 362, 369 (7th Cir. 1996). The court may "exclude expert testimony when it determines that the underlying facts or data cannot support the conclusion – i.e., when the analytical gap between the two is too great to put the conclusion before a jury." *Cunningham v. Masterwear, Inc.*, No. 1:04-cv-1616, 2007 WL 1164832, at *2 (S.D. Ind. Apr. 19, 2007).

### a. Causation

Defendant argues that Dr. Margherita's methodology regarding causation is not scientifically reasonable and thus his opinions are mere conjecture. Here, Dr. Margherita reached his conclusions by "[r]eviewing the medical records, obtaining [Plaintiffs'] medical history, [and] doing a physical examination." (Margherita Dep. 20:16-20). Particularly, the physical examination entailed using "standardized protocols for the determination of strength, range of motion, sensation, and functioning of the bodily systems. Measurements were derived using protocols as described in standard texts." (Def.'s Exs. C, D, and E). For example, Dr. Margherita conducted a kind of "general examination" by examining Plaintiffs' vital signs and body systems while also focusing on posture, range of motion, and assessing their lungs. (Margherita Dep. 20:16-21:5). Dr. Margherita conceded, however, that he performed the same examination of the Plaintiffs as he would for any patient, no matter the injury. (*Id.* at 21:13-16). Indeed, he did not perform any specialized pulmonary testing on any of the Plaintiffs. (*Id.* at 100:24-101:2). Instead, Dr. Margherita relied extensively on the opinions of treating

physicians, Drs. Shady and Haacke. (*Id*. at 31:8-15). Based on this analysis and physical examination, Dr. Margherita concluded that each Plaintiff suffered from a form of reactive airway disease that is the direct result of each Plaintiff's exposure to chlorine gas. To that end, Dr. Margherita estimated that Rachel Taylor and Sarah Taylor sustained "moderate exposure" to chlorine gas, but he neither defined "moderate exposure" nor explained how this estimate was calculated.

Both parties direct the court to *Cunningham* for the issue, and the court agrees that its holding is instructive. There, the district court excluded an expert's testimony that PCE contamination caused the plaintiffs' illnesses because (1) no determination was made as to the type of exposure to PCE plaintiffs faced and whether this was enough to cause the symptoms; (2) the expert failed to show the medical literature demonstrates that these type of symptoms are possible at all; and (3) the expert failed to show that PCE was the specific cause of plaintiffs' ailments. *Cunningham*, 2007 WL 1164832, at *8.

These same critical factors are also present here. Indeed, Dr. Margherita stated only a conclusory finding that Plaintiffs had "moderate exposure" to chlorine gas but neither defined that amount nor discussed to what extent such exposure caused symptoms. *See id*. at *5 (finding that even if plaintiffs were exposed to PCE, if "the dose and duration that they were exposed to is medically insignificant, then it is irrelevant to their condition"). Further, Dr. Margherita did not analyze the medical literature to arrive at his conclusions; rather, his conclusions were already reached before Plaintiffs' counsel provided the literature and thus only "further supported" his conclusions. *See id*. at *2 (stating general causation can generally be "demonstrated by a review of the scientific

16

and medical literature"). Lastly, Dr. Margherita failed to conduct any type of differential diagnosis. A differential diagnosis involves ruling in and ruling out the possible causes of a medical problem and identifying the "last remaining, or most probable, 'ruled in' cause of a medical problem." *Ervin*, 492 F.3d at 903. Dr. Margherita did not conduct such analysis, nor did he discuss or rule out any other potential causes of Plaintiffs' symptoms. *See id.* at 904 ("A differential diagnosis satisfies a *Daubert* analysis if the expert uses reliable methods").

Dr. Margherita failed to articulate any reason his conclusions are accurate as to causation; instead, the court is left with nothing but his *ipse dixit* opinion. His opinion essentially boils down to exposure to chlorine gas *may* cause the types of symptoms seen in Plaintiffs, *ergo*, chlorine exposure caused the symptoms. This does not allow the court to assess what, if any, methodology was used in arriving at these conclusions. This is not sufficient methodology for proving causation. *See id.* at 904-05 ("The mere existence of a temporal relationship between taking a medication and the onset of symptoms does not show a sufficient causal relationship"). Accordingly, Dr. Margherita has not set forth reliable methodology for determining causation, and this opinion must be excluded.

### b. Impact on Work Ability

Finally, the court examines whether Dr. Margherita had a reliable basis for his opinions regarding the impact of the respiratory injuries on Plaintiffs' work ability. As in all his opinions, Dr. Margherita relied heavily on the prepared reports of the Plaintiffs' treating physicians; this, however, does not destroy the reliability of his conclusions. *See Cunningham*, 2007 WL 1164832, at *5 ("[r]elying on reports prepared by others is an

17

acceptable way to determine the nature and extent of [chemical] exposure . . ."). Moreover, Dr. Margherita conducted his own "hands-on" physical examination of the Plaintiffs and has prior experience in assessing the vocational limitations of patients. Accordingly, Dr. Margherita created a logical bridge between the data and his conclusions and thus may testify regarding this subject.

### III. Conclusion

For the reasons set forth above, Defendant's motion to exclude Dr. Margherita (Docket # 110) is **GRANTED IN PART** and **DENIED IN PART**. Also, as noted before, Defendant's motion to strike Plaintiffs' untimely response (Docket # 155) is **GRANTED**.

**SO ORDERED** this 3rd day of December 2013.

_____
RICHARD L. YOUNG, CHIEF JUDGE
United States District Court
Southern District of Indiana

Distributed Electronically to Registered Counsel of Record.